IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KELLOGG COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | )   Case No. _____ |
| v. | ) |
| | ) |
| | ) |
| BCTGM INTERNATIONAL UNION, | ) |
| BCTGM LOCAL 3G, BCTGM LOCAL | ) |
| 50G, BCTGM LOCAL 252G, and | ) |
| BCTGM LOCAL 374G, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Kellogg Company by and through its attorneys, for its claims against Defendants states as follows:

### The Parties

1.  Plaintiff Kellogg Company ("Kellogg" or the "Company") is a Michigan corporation having its principal place of business in Battle Creek, Michigan.

2.  Kellogg manufactures breakfast cereal at plants throughout the United States, including at four Ready-to-Eat Cereal ("RTEC") facilities located in Omaha, Nebraska, Battle Creek, Michigan, Memphis, Tennessee, and Lancaster, Pennsylvania ("the RTEC facilities").

3.  Kellogg distributes breakfast cereal to customers and distributors throughout the United States from the RTEC facilities.

4.  Kellogg is an employer in an industry affecting commerce as defined in Sections 501(1) and (3) and 2(2), (6) and (7) of the Labor Management Relations Act, 29 U.S.C.

1

§§ 142(1) and (3) and §§ 152(2), (6) and (7), and within the meaning of Section 301 of the Labor Management Relations Act, 29 U.S.C. §185.

5. Defendant Bakery, Confectionery, Tobacco Workers, and Grain Millers ("BCTGM") International Union is a labor organization that represents employees in an industry affecting commerce, as defined in 29 U.S.C. § 152, with its principal office in Kensington, Maryland. The BCTGM International Union is referred to as "the International Union."

6. Defendant BCTGM Local 50G is a labor organization that represents employees in an industry affecting commerce, as defined in 29 U.S.C. § 152, with its principal office in Omaha, Nebraska.

7. Defendant BCTGM Local 3G is a labor organization that represents employees in an industry affecting commerce, as defined in 29 U.S.C. § 152, with its principal office in Battle Creek, Michigan.

8. Defendant BCTGM Local 252G is a labor organization that represents employees in an industry affecting commerce, as defined in 29 U.S.C. § 152, with its principal office in Memphis, Tennessee.

9. Defendant BCTGM Local 374G is a labor organization that represents employees in an industry affecting commerce, as defined in 29 U.S.C. § 152, with its principal office in Lancaster, Pennsylvania.

10. BCTGM Locals 3G, 50G, 252G, and 374G are individually referred to as a "Local Union" followed by the number/letter identifier and collectively referred to as "the Local Unions."

11. The International Union and the Local Unions together are collectively referred to as "the Unions."

**Relationship Between the Local Unions and the International Union**

12. Each of the Local Unions represents certain hourly production employees at separate bargaining units at each of Kellogg's RTEC facilities. The Local Unions are affiliated with, and members of, the International Union.

13. Each of the Local Unions has also designated and authorized the International Union to act as its agent and on its behalf, including but not limited to, with respect to collective bargaining, negotiations, and labor contract administration for labor agreements between the Unions and Kellogg.

14. Upon joining each of the Local Unions, each hourly employee also becomes a member of the International Union.

15. The Local Unions and their members are bound by the International Union's Constitution. The International Union's Constitution provides that:

> Membership in the International Union constitutes an exclusive and irrevocable designation of the International Union by each member to engage in collective bargaining on his/her behalf, and an undertaking to be bound by all decisions of the International Union affecting his/her status and duties as a union member.

16. Each of the Local Unions may create their own Bylaws, but those Bylaws are subject to, and must be consistent with, the International Constitution.

**Jurisdiction and Venue**

17. This action arises under Section 301 of the Labor Management Relations Act of 1947 ("the Act"), 29 U.S.C. §185.

18. Kellogg seeks to recover damages for ongoing breaches of a labor agreement between Kellogg, the International Union, and the Local Unions. The Court has subject matter jurisdiction under 29 U.S.C. § 185(a).

19. Venue is proper under 29 U.S.C. § 185(c) and 28 U.S.C. § 1391(b) because the International Union's and Local Unions' duly authorized officers and agents have engaged in, and continue to engage in, representing and acting on behalf of employee members with Kellogg Company in Omaha, Nebraska.

20. This Court has personal jurisdiction over the International Union and the Local Unions for the same reasons that venue is proper under 29 U.S.C. § 185(c).

**The Parties' Collective Bargaining Relationship and Current "Master Agreement"**

21. Each Local Union represents a separate and distinct bargaining unit for its respective location. At each RTEC facility, Kellogg is a party to separate local collective bargaining agreements with each separate Local Union. These so-called "Supplemental Agreements" cover terms and conditions of employment at each particular RTEC facility. The International Union is not a party to any Supplemental Agreements between Kellogg and the Local Unions.

22. Beginning in 1969, however, Kellogg, the Local Unions, and the International Union (as the Local Unions' designated representative), began to negotiate a voluntary, coordinated collective bargaining agreement (the so-called "Master Agreement"). The Master Agreement covers only those subjects that the parties specifically agree to include in it; said differently, it may cover only certain terms and conditions of employment that the parties agree to apply uniformly across all of the RTEC facilities. Examples have been insurance benefits, vacation, scheduled holidays, and whether to grant cost of living wage adjustments.

23. The parties have voluntarily negotiated successive Master Agreements since February 1969. In September 2012, the parties negotiated and executed a Master Agreement with an anniversary/potential expiration date of October 3, 2015.

4

24. In July 2015, Kellogg, each Local Union, and the International Union negotiated and executed a replacement Master Agreement through a July 17, 2015 Memorandum of Agreement (MOA). The parties subsequently incorporated all changes agreed upon in 2015 and executed an updated, final version of their current Master Agreement. (**Exhibit 1** (the "2015 Master Agreement").)

25. In 2020, by operation of the 2015 Master Agreement's evergreen provisions, the 2015 Master Agreement continued for at least one additional year, until at least October 5, 2021. The parties agreed "the 2015-2020 Master Agreement has been in effect and will continue in effect until October 5, 2021, subject to the provisions in Section 10.03" of the 2015 Master Agreement. (**Exhibit 2**.)

26. Section 10.03 of the 2015 Master Agreement is the "Duration Clause."

27. Section 10.03(a) of the 2015 Master Agreement provides:

This Agreement shall become effective as of October 4, 2015 and shall remain in full force and effect until October 5, 2020. The Agreement shall continue in effect without change from year to year thereafter, except that either party to this Agreement who wishes to terminate, amend or modify this Agreement on October 5, 2020, or at the end of any yearly period thereafter, shall give written notice to the other party not less than sixty (60) days prior to the anniversary date of the Agreement.

28. However, even if timely and proper notice to terminate the Master Agreement is provided under Section 10.03(a), the Master Agreement's terms do not automatically end on October 5, 2021.

29. Under Section 10.03(d) of the 2015 Master Agreement, the parties agreed to extend the life of the Master Agreement during negotiations. They agreed that the 2015 Master Agreement's terms continue until the bargaining parties reach agreement on the term of a replacement agreement or have fully exhausted their authority and exhausted all attempts to

5

reach agreement, resulting in a good faith impasse that would suspend their mutual duty to negotiate over mandatory subjects consistent with their obligations under federal labor law.

30. Specifically, Section 10.03(d) provides:

> During the pendency of negotiations, the terms and conditions of this Agreement, as they existed prior to the commencement of such negotiations, <u>shall continue in full force and effect</u>.

(**Exhibit 1**, Section 10.03 (emphasis added).)

31. There are no exclusions of any Master Agreement terms from Section 10.03(d)'s language requiring that "the terms and conditions of this Agreement, as they existed prior to the commencement of such negotiations, shall continue in full force and effect."

32. The Unions agreed to a broad no-strike clause in exchange for Kellogg's agreement to prohibit lockouts. More specifically, the 2015 Master Agreement includes the following reciprocal prohibition on any strikes and/or work stoppages, including union strikes or employer lockouts:

> During the life of this Master Agreement no strike or work stoppage in connection with disputes arising hereunder shall be caused or sanctioned by the International Union, any of the Local Unions or by any member thereof; and no lockout shall be ordered by the Company in connection with such disputes.

(**Exhibit 1**, Section 10.01(a).)

33. Under the terms of the 2015 Master Agreement, officers and agents of the International Union and the Local Unions travel to and communicate with Company representatives at Kellogg's RTEC facilities, including in Omaha, Nebraska, to represent members at or in connection with grievance adjustments, arbitrations and hearings, meetings and other labor relations matters.

34. Officers and agents of the International Union and Local Unions also routinely and consistently contact Kellogg's labor relations representatives directly by phone,

email, and in person to represent their members in matters that arise at the unionized RTEC facilities, including those arising under and in connection with the 2015 Master Agreement and at the Omaha, Nebraska RTEC facility.

35. Representatives for Kellogg, the International Union, and the Local Unions have historically met at neutral locations to negotiate Master Agreements. At the bargaining table, one or more agents for the International Union leads negotiations for the Unions and acts on behalf of the Local Unions.

### The Parties' Pending Negotiations for a Successor Master Agreement

36. On July 20, 2021, Roger Miller, an International Union Vice President, sent a notice to Ken Hurley, Kellogg's Vice President and head of Labor Relations, seeking to modify or terminate the 2015 Master Agreement, specifically referencing Section 10.03, the Duration Clause. In this notice, Mr. Miller wrote in relevant part:

> This communication is sent pursuant to the provisions of the Master Agreement expiring October 4, 2021, between the Kellogg Company and the BCTGM International Union, AFL-CIO and more particularly that portion of the Agreement entitled "Duration" appearing as Section 10.03.
>
> \*\*\*
>
> You are hereby notified that the BCTGM for itself and its affiliated Local Unions: Local 3G Battle Creek, Michigan; Local 50G, Omaha, Nebraska; Local 252G Memphis, Tennessee; Local 374G Lancaster, Pennsylvania and, signatories to said Master Agreement, seek to modify or terminate the Master Agreement expiring October 4, 2021.

(**Exhibit 3**.)

37. The parties exchanged initial proposals on September 8, 2021.

38. On September 21, 2021 the parties met in Indianapolis, Indiana to begin negotiations for a replacement Master Agreement. The chief spokesperson for the Unions was Roger Miller. The chief spokesperson for Kellogg was Ken Hurley.

39. To date, the parties have met several times for negotiations.

40. Negotiations remain pending as the parties have not yet reached an agreement for a replacement Master Agreement, nor have they exhausted all efforts and reached an overall impasse on mandatory topics for bargaining.

41. The parties have reached tentative agreements on several minor matters and remain apart on multiple important scheduling, operational, and economic matters that will require additional meetings and discussions at the bargaining table.

42. On September 30, 2021, in an attempt to advance slow-moving negotiations, Kellogg informed the Unions that the Company was prepared to present a comprehensive contract offer, which included significant movement toward the Unions' position on many important terms. The Unions, through their chief spokesperson, Mr. Miller, stated that they would not agree to allow Kellogg to meet with the Unions' negotiation committee for the Company to present its new proposals and for further discussions on these new contract proposals. Kellogg, however, confirmed by text message that the Unions were not refusing to continue to negotiate. (**Exhibit 4**.)

43. Exhibit 4 attached hereto is a copy of a text message exchange between Roger Miller and Ken Hurley. (*Id.*)

44. Kellogg sent the Unions an email on September 30, 2021 reiterating that the Company continued to have flexibility in its positions and sought to continue negotiations. That email stated in relevant part:

> This morning, we communicated to you that we had a proposal that we wanted to present to the bargaining committee that included a shortened progression to legacy wage rates and other enhanced economics. You responded that the Union is not willing to meet for us to present our new proposal unless Kellogg gets off "two tier". I asked if the Unions were refusing to negotiate further and if your bargaining committee is leaving Indianapolis. You said "no" to both.
>
> Like the Unions, we will also continue to negotiate; as I told you we have room to move on many issues. Please let me know when the Union is available to meet in person with our full committees.

(**Exhibit 5.**)

45. The following day, October 1, 2021, Kellogg provided the Unions with a comprehensive contract offer to settle that included a special one-week PTO (paid time off) incentive for all unit employees if a replacement Master Agreement was fully ratified by the bargaining unit employees by October 4, 2021. Because the Unions refused to meet in person, Kellogg provided this offer and new set of contract proposals, along with an explanation and summary, by email on or about 10:14 a.m. on October 1, 2021. (**Exhibit 6** (email with offer) **Exhibit 7** (offer) & **Exhibit 8** (summary of offer).)

46. In providing its modified proposals, Kellogg explained, in relevant part, to the Unions as follows:

> In the absence of any counterproposals from the Union, the Company has made significant moves in an effort to reach an agreement.
>
> We remain willing to work with the Unions in our efforts to bridge the current gaps and put together a deal. We are disappointed that the Unions choose not to meet to allow Kellogg to present its proposals and to discuss them with the bargaining committee, but we are glad that you've confirmed that the Unions are not refusing to continue negotiations.
>
> As you can immediately see, this Offer is neither "concessionary" nor "status quo," and includes increases in wages and benefits for all employees. It continues to provide our employees with well

9

> above market wages and benefits. . . . [B]ecause we have not had the benefit of discussions on these new proposals, we are unclear whether you might want to structure the economics differently. We remain open to negotiating not only how the economics might be structured, but also any non-economic topics that might help us reach a deal.

(**Exhibit 6**.)

47. The Unions and/or their agents received the email attached as Exhibit 6.

48. Approximately thirty minutes after Kellogg sent its email on October 1, 2021, with a comprehensive contract offer, Roger Miller text messaged Ken Hurley that "[t]he Union does not recognize any offer by the Company not given at the table." (**Exhibit 9**.)

49. Exhibit 9 attached hereto is a copy of a text message exchange between Roger Miller and Ken Hurley. (*Id.*)

50. Kellogg, through Mr. Hurley, then delivered its written offer in person to David Woods, the International Union's Secretary-Treasurer and member of the Unions' negotiating team, at the table on October 1, 2021. (*Id.*) The Unions again claimed that it would not recognize the offer, Mr. Woods became upset, and told Mr. Hurley to "shove your offer up your ass."

51. The Unions failed to consider or respond to Kellogg's offer and new proposals; the Unions were also unwilling to meet in person to discuss them. Instead, on the afternoon of October 1, 2021, the Unions gave Kellogg a written notice of their intent to strike "if an agreement is not reached upon expiration of the current RTEC Cereal Master Contract." (**Exhibit 10**.) The notice did not state that parties had reached impasse and did not identify any specific date for the future intended strike.

52. On October 1, 2021, the Unions informed Kellogg that their bargaining committee intended to leave Indianapolis and to end the parties' then-current negotiation session as of Saturday morning, October 2, 2021.

53. Kellogg responded with an email sent to the Unions at 4:56 p.m. on October 1, 2021 in which Kellogg: (a) confirmed the Unions' position that they would not meet in person on October 2 and 3 as the parties had originally scheduled; (b) explained that the strike notice was "premature" because Kellogg "still had room to move;" (c) informed the Unions that the Company would be sharing its offer previously made to the Unions with RTEC employees; and (d) reiterated that the "Company remains ready, willing and able to continue bargaining." (**Exhibit 11**.)

54. Kellogg also shared with the Unions eight pages of materials that the Company planned to give to RTEC employees summarizing Kellogg's comprehensive contract offer, asking whether the Union had questions. (**Exhibit 12**.)

55. Among the wage and benefit improvements that Kellogg offered to the Unions on top of existing above-market employment terms were the following:

- Wage increases for all employees, including 9% wage increases for Legacy employees, a pathway for Transitional Employees to reach the legacy rate, and other significant increases for Transitional Employees.
- No change to employees' current Healthcare plans.
- Enhanced retirement benefits
- Elimination of Kellogg's proposals on alternative scheduling.
- One-week paid time off at the employees' vacation rate if a replacement contract was ratified by October 4, 2021.

(*Id.*).

56. The Unions did not submit Kellogg's comprehensive offer to their members for a ratification vote. Nor did the Unions reject Kellogg's offer. Instead, they communicated to their members that Kellogg's offer is "fake."

57. Both parties have reached out to a mediator with the Federal Mediation and Conciliation Services (FMCS) to assist the parties in their ongoing efforts to negotiate a new Master Agreement. Kellogg contacted the mediator or October 4, 2021 and the Unions confirmed on October 5 that they had done the same.

58. Despite the Unions' attempts to prevent Kellogg from explaining and discussing its October 1, 2021 updated proposals that contain significant movement on its positions, and despite the Unions' negotiations tactics, Kellogg's October 1, 2021 Offer and modified contract proposals were in fact made and given to the Unions both electronically and in person.

59. Kellogg is awaiting the Unions' substantive response to its October 1, 2021 Offer.

60. As of the date of filing this Complaint, the Master Agreement terms continue in full force and effect because negotiations between the parties remain pending; there is no new Agreement or impasse.

61. Kellogg has repeatedly expressed to the Unions that it continues to have flexibility in its bargaining proposals and remains ready to continue bargaining in good faith with the Unions to reach agreement for a replacement Master Agreement.

62. The Unions likewise confirmed that negotiations remain pending, including in a text message from Mr. Miller to Mr. Hurley confirming that the Unions were continuing to bargain and in subsequent communications to its members.

63. Neither Kellogg nor the Unions have exhausted all of their authority and efforts in negotiations and there is flexibility and room for movement on both sides.

64. The Unions have acknowledged this fact. For example, in an October 2, 2021 communication to its members, the Unions identified multiple areas of concern with Kellogg's September 30 comprehensive offer to settle that have yet to be discussed at the table and stated: "We know there is more on the table, we need the membership to authorize strike permission to show the company that we are not willing to accept a concessionary offer to present and future members." (**Exhibit 12**.)

**The Unions Cause and Sanction a Strike in Breach of the 2015 Master Agreement's Terms**

65. Notwithstanding Kellogg's statements and actions demonstrating its flexibility and desire to continue bargaining in good faith, and despite the Unions' acknowledgement that negotiations over mandatory subjects are continuing, the International Union and the Local Unions have caused, coordinated, sanctioned and supported a work stoppage "during the pendency of negotiations," *i.e.*, when the 2015 Master Agreement's no-strike/no lockout out clause in Section 10.01(a) continues in "full force and effect."

66. More specifically, on about 1:00 a.m. EST on October 5, 2021 the International Union and each Local Union caused, sanctioned, and supported a coordinated strike at each of Kellogg's four RTEC facilities, including in Omaha, Nebraska.

67. Upon information and belief, at the direction of the International Union, the Local Unions conducted strike permission votes for each of the bargaining units on the afternoon of October 4, 2021, including in Omaha, Nebraska.

68. Prior to the commencement of the strike and after receiving reports that the Unions planned to strike and walk out after midnight on October 4, Mr. Hurley sent the Unions an email reminding the Unions of their continuing no strike clause obligation during the parties' ongoing negotiations. That email to Roger Miller stated:

> We are surprised and disappointed to hear reports that the unions will go on strike at midnight tonight. This is to advise you that this would be a serious violation of the No Strike provisions of the Master Contract. The Unions have not provided a substantive response to our comprehensive contract proposal provided on Oct. 1, other than to say that they do not acknowledge the offer---yet remain ready and willing to continue negotiations. For our part, we couldn't have been more clear in my 5pm EST email to you on Friday afternoon that the Union's 48 hour strike notice is premature because the Company still has room to move within its Comprehensive Offer. I also contacted Scott Beckenbaugh at the FMCS this afternoon to see if they might be available to engage the parties in an effort to bridge our differences.
>
> We expect the Unions to honor their obligations under the Master Contract by stopping the strike during the pendency of these negotiations. Please provide dates when the unions are available to continue in-person negotiations and I will coordinate those dates with the Federal Mediator.

(**Exhibit 13**.)

69. The Unions have refused Kellogg's requests to honor their contractual obligation and failed to take any actions to stop the strike, which they have unlawfully called, supported, encouraged, and continued.

70. The Unions' actions described above, and their continuing sanctioning and support of striking members at each of Kellogg's four RTEC facilities, including at the Omaha

plant, constitutes a willful breach of the 2015 Master Agreement and the parties' no-strike clause as set forth in Section 10.01(a).

## COUNT ONE – BREACH OF CONTRACT (Damages)

71. Kellogg realleges and reincorporates the previous paragraphs in this Complaint as if fully set forth herein.

72. The 2015 Master Agreement constitutes an enforceable labor contract between Kellogg, the International Union, and the Local Unions.

73. The terms of the 2015 Master Agreement, including Sections 10.01 and 10.02, continue in full force and effect during negotiations between Kellogg and the Unions for a replacement Master Agreement until the parties reach agreement or impasse.

74. Indeed, the only other time that the Unions have authorized and called a multi-plant strike in connection with Master Agreement negotiations occurred in 1972; the Unions initiated the multi-plant strike several weeks after the anniversary date and only after the parties had agreed that their negotiations had deadlocked and reached impasse.

75. Current negotiations remain pending. There has been no agreement and the parties have not reached a good faith impasse in bargaining over mandatory subjects.

76. The duty to bargain over such subjects continues and remains pending; it is not suspended unless and until the parties deadlock and reach a good faith overall impasse in negotiations.

77. By causing, sanctioning, coordinating, and/or supporting Kellogg's RTEC employees to strike and/or engage in work stoppages during the pendency of negotiations, the International Unions and the Local Unions have willfully breached and violated Section 10.01(a) of the 2015 Master Agreement.

15

78. By providing a strike notice to Kellogg while negotiations are pending and prior to the expiration of the Master Agreement, the Unions have also breached Section 10.02 of the Master Agreement.

79. The Unions' improper actions and continuing contract breaches in the form of a four-plant strike are intended to inflict significant economic harm of Kellogg before the parties have fully exhausted all opportunities to negotiate a replacement agreement.

80. As a direct result of the Unions' contract violations and unlawful actions, Kellogg has suffered, and continues to suffer, significant economic and other damages.

81. The Unions' actions and failure to prevent employees from striking in violation of Section 10.01(a) of the 2015 Master Agreement has caused and will continue to cause economic damages and other harm to Kellogg.

82. The Unions' actions are not only willful breaches of the parties' contract, but they are also being carried out for unlawful purposes, including for the purpose of damaging and disrupting Kellogg's business.

83. Kellogg has suffered damages and losses as a result of the Unions' breaches of the Agreement, which are currently estimated at millions of dollars per day across all four plants. Kellogg will continue to suffer such damages and losses until Defendants cease their breaches and unlawful strike activity as alleged in this Complaint.

## **PRAYER FOR RELIEF**

Wherefore, Kellogg respectfully requests that the Court enter orders and judgments in its favor and against the International Union and the Local Unions as follows:

A. Enter judgment finding that the International Union and each of the Local Unions have breached the 2015 Master Agreement;

B. Award damages against the Unions, jointly and severally, in an amount to be determined arising out of the International Union's and the Local Unions' breaches of the 2015 Master Agreement;

C. Direct that punitive damages be imposed upon Defendants;

D. Award Kellogg all of its legal fees and other costs; and

E. Order all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

DATED this 5th day of October, 2021.

Respectfully submitted,

KELLOGG COMPANY, Plaintiff.

By: /s/ Ruth A. Horvatich
    Ruth A. Horvatich (#24776)
    A. Stevenson Bogue (#15509)
    Abigail M. Moland (#23741)
    McGrath North Mullin & Kratz, PC LLO
    First National Tower, Suite 3700
    1601 Dodge Street
    Omaha, Nebraska 68102
    (402) 341-3070
    (402) 341-0216 fax
    rhorvatich@mcgrathnorth.com
    sbogue@mcgrathnorth.com
    amoland@mcgrathnorth.com

**ATTORNEYS FOR PLAINTIFF**